# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

          Plaintiff,

                                **REPORT AND RECOMMENDATION**

          v.                        11-CR-6116

JAMES KIMBLE,

          Defendant.

---

## Preliminary Statement

By text Order of Judge David G. Larimer, dated June 14, 2011, all pre-trial motions have been referred to this Court pursuant to 28 U.S.C. § 636(b)(1)(A)-(B). (Docket # 9). Currently before the Court are defendant James Kimble's motions to dismiss the Indictment (Docket # 15) and to suppress statements (Docket # 20). The Government has filed papers in opposition to these motions. (Dockets ## 17, 22). On January 23, 2012, the Supreme Court issued its Reynolds v. United States, ___ U.S. ___, 132 S. Ct. 975 (2012) decision which addresses issues presented in defendant's motion to dismiss. This Court directed the parties to file supplemental briefs to address the effect Reynolds has on defendant's motion. On February 29, 2012, defendant filed a supplemental brief in further support of his motion (Docket # 25), and on March 30, 2012, the Government filed its supplemental brief in further opposition (Docket # 28). On April 13, 2012, a hearing was held and arguments were heard from the parties. The Court directed further

supplemental briefing on various issues.  On April 26, 2012, defendant filed a second supplemental brief (Docket # 30), and on May 30, 2012, the Government filed its second supplemental brief (Docket # 35).  The following is my Report and Recommendation as to the defendant's motions.

## Factual Background

On March 8, 1983, defendant James Kimble was convicted of Rape in the First Degree in violation of New York State Penal Law § 130.65, for which he received a sentence of 10-20 years imprisonment.  <u>See</u> Affidavit of Charles Salina (hereinafter "Salina Aff.") annexed to Docket # 1.  Kimble served sixteen years of his 10-20 year prison sentence.  Upon his release from prison in 1999, Kimble was required to complete an initial sex offender registration in compliance with New York State's sex offender registry, and is required to update his registry in New York State every ninety calendar days after his prison term for the rest of his life, including reporting any change of address to the New York State Department of Criminal Justice Services within ten days of changing his address.  <u>Id.</u>

On March 6, 2009, Kimble updated his registry and signed and completed a Rochester Police Department ("RPD") "Sex Offender 90 Day Address Verification Form."  <u>Id.</u>  On March 9, 2009, Kimble notified the RPD that he was changing his address.  <u>See</u> Exhibit "B"

attached to Affirmation of Anne M. Burger, Esq. (hereinafter "Burger Aff.") annexed to Docket # 15.  On April 6, 2009, RPD Investigator C.J. Dominic interviewed defendant Kimble at his Rochester home regarding a "cold-case rape/murder which occurred in Rochester in the 1970's" after Kimble became "the lead suspect." See Salina Aff.; see also Government's Memorandum in Opposition (hereinafter "Gov. Opp. Memo") at p. 10 n.1.  On April 25, 2009, Kimble left a voicemail message for a City of Rochester Police Investigator indicating that he was moving out of New York State and that he would follow up and update his information when he obtained his new address.  See Burger Aff. at ¶ 8; see also Exhibit "C" attached to Burger Aff.  At some point in April 2009, Kimble moved to Florida to care for his "very ill" sister.  See Burger Aff. at ¶ 8.  Kimble maintains that he did not have a permanent address while he was in Florida.  Id.  On January 11, 2010, Kimble was arrested in Florida.  See Florida State Attorney's Office Interdepartmental Memorandum dated May 27, 2010 attached as Exhibit "6" to Gov. Opp. Memo (noting that defendant "has a pending New York indictment warrant for murder.  Defendant fled from the NY warrant to Florida and hid at his sister's house").

Upon his arrest on January 11, 2010, Kimble was taken to the Sarasota Florida Police Department and placed in an interview room. See Government's Response to Defendant's Supplemental Motion (Docket # 22) at p. 1.  The interview room contained both video and

audio recording equipment.  Id.  The video recording contains a running time and date stamp which starts on January 11, 2010 at 12:28 p.m.[1]  The recording reveals that between 12:28:00 and 13:13:12 Sarasota Police Detective Laughlin along with a Sarasota Police Deputy entered the interview room, removed defendant's handcuffs, inventoried his personal property and then left.  See Transcript of January 11, 2010 Kimble Interview (hereinafter "1/11/10 Tr.") at pp. 1-3.  At 13:13:13, Detective Laughlin re-entered the interview room with Detective Cassidy and formally introduced themselves to Kimble.  Id. at p. 3.  They told Kimble that they would like to speak with him about why he was arrested. Id.  Detective Laughlin advised plaintiff that "In order for us to talk to you about why you are here, I have to read you your Miranda warnings, okay?"  Id.  Detective Laughlin then removed a Miranda rights card from his wallet and proceeded to read to Kimble the rights on the card.  Id. at pp. 3-5.[2]  After reading each right, Laughlin asked Kimble if he understood the right that had been read to him.  Id.  Kimble answered "yes" each time after being asked if

_____

[1] In response to defendant's motion to suppress (Docket # 20), the Government submitted to the Court two DVDs which contain the video recordings of Kimble in the interview room at the Sarasota Police Department on January 11, 2010, as well as a copy of the transcript from an interview that took place with Sarasota police officers and defendant Kimble that day.  The Court has reviewed both DVDs and the transcript.

[2] Though the transcript does not indicate that Detective Laughlin read the rights from a Miranda rights card, the Court has reviewed the DVD of the interview which shows this.

4

he understood the right.   Id.   Detective Laughlin advised Kimble that "[i]f you decide to answer any questions without the lawyer present, you will still have the right to stop answering at any time.  You will also have the right to stop answering at any time until you talk to a lawyer." Id. at p. 4.  Kimble then indicated that he understood.  Id. at p. 5.  Detective Laughlin then asked Kimble, "[w]ith these rights in mind, do you wish to talk to us now?"  Id.  Kimble responded, "yes."  Id.  Detective Laughlin then began to ask him some questions about his move to Florida from Rochester, his prior conviction and prison sentence for a sex offense, as well as his duty to register as a sex offender.  Id. at pp. 5-12.  After a few minutes of answering questions, Kimble asked to use the bathroom and the Detectives had him escorted to a restroom.  Id. at p. 12.

A few minutes later, Kimble was escorted back to the interview room and Detective Cassidy and Investigator CJ Dominic entered the room.  Id. at p. 13.  Cassidy and Dominic then proceeded to ask Kimble more questions about, inter alia, his understanding of New York State and Florida's requirements for registering as a sex offender.  After approximately twenty minutes of questioning, Investigator Dominic asked Kimble if he would like "something to drink?  You want pop or something, water?  Can I get you a water or something?"  Id. at p. 44.  Kimble answered that he would like a water, Dominic and Cassidy then exited the room and a few minutes

later Dominic brought Kimble a water.   Id. at pp. 44-45.
Approximately ten minutes later, Cassidy and Dominic returned to
the interview room.   Dominic told Kimble that "we're going to have
to talk to you about something else."   Id. at p. 45.   Dominic
proceeded to ask him questions concerning "a homicide that occurred
back in 1972."   Id. at p. 47.

Dominic and Cassidy questioned Kimble at length about the
circumstances and details surrounding the 1972 homicide of Annie
Mae Cray.   After over 1.5 hours of questioning, Kimble stated:
"Maybe I do need an attorney then because if you're placing the
blame somewhere."   Id. at p. 168.   Investigator Dominic immediately
responded: "Well, again we're here to do our job.   Do you
understand?"   Id. at pp. 168-69.   Kimble responded "yes," and
Cassidy and Dominic continued the interview.   Kimble did not make
another reference to obtaining an attorney.   Approximately two
minutes later, Cassidy and Dominic asked Kimble if he "need[ed]
anything" or wanted more water, and Kimble responded "no."   Id. at
p. 170.   After approximately 37 minutes of more questioning, Kimble
told Cassidy and Dominic that "I don't want to talk about it no
more."   Id. at p. 190.   Dominic responded by asking Kimble if they
could show him some pictures, and Kimble responded, "no."   Id.
Cassidy and Dominic continued to interview Kimble.   The interview
concluded and Kimble was escorted from the interview room
approximately 45 minutes later.   At no point during the interview

6

did any of the police officers threaten Kimble, force him to waive his rights, show him their weapons, or make any promises to him in an effort to get him to waive his rights.

On June 14, 2011, a federal Grand Jury sitting in the Western District of New York returned a one-count Indictment against defendant Kimble, therein charging him with Failure to Register as a Sex Offender in violation of 18 U.S.C. § 2205(a). See Indictment (Docket # 8). The Government alleges that Kimble traveled in interstate commerce from New York to Florida and knowingly failed to register and to update a registration as required by the Sex Offender Registration and Notification Act ("SORNA"). The Government asserts that Kimble "maintained a residential address in Florida for months and applied for and received Welfare benefits from the State of Florida for more than half a year." See Gov. Opp. Memo at p. 10. The Government points out that "[r]ecords from the State of Florida indicate that the defendant applied for State Welfare Benefits as early as May 20, 2009." Id.; see also Exhibit "1" attached to Gov. Opp. Memo.

On his Welfare application dated May 20, 2009, Kimble listed his "Household Living Address" as 1060 Indian Park Drive, Sarasota, Florida 34234. See Exhibit "1" attached to Gov. Opp. Memo. He claimed to pay $700.00 per month for rent, and also claimed to pay monthly utility bills, including $95.00 per month for telephone and $150.00 per month for electricity. See id. Two months later, on

7

July 17, 2009, in an application for Florida Medical Benefits Assistance, defendant again listed his address as 1060 Indian Park Drive in Sarasota. <u>See</u> Exhibit "2" attached to Gov. Opp. Memo. On July 31, 2009, defendant completed another benefits application and again listed his "Household Living Address" as 1060 Indian Park Drive, still claimed to be paying $700 per month in rent. <u>See</u> Exhibit "3" attached to Gov. Opp. Memo. On two of his State of Florida benefits applications, Kimble indicated that he was a "Florida resident" who was not homeless. <u>See</u> Exhibits "1" and "3" attached to Gov. Opp. Memo. On July 31, 2009, Kimble also applied for Florida Medicaid Benefits and reported the same address and indicated that he was paying $700 per month in rent. <u>See</u> Exhibit "4" attached to Gov. Opp. Memo. In November 2009, the State of New York sent an Address Verification form to defendant at his last known address of record in New York: 314D Chatham Gardens, Rochester. The resident at that time is defendant's aunt, Cloney Brown, and she forwarded the form to defendant Kimble at his address in Florida. Despite receiving the form at his Sarasota address, defendant mailed the form back to New York, therein indicating that he had "no permanent address." <u>See</u> Exhibit "E" attached to Burger Aff. The Government argues that Kimble moved to Florida and failed to update his registry/address in an attempt to "hide from the Rochester Police." <u>See</u> Gov. Opp. Memo at p. 10.

### Discussion

### I.    Defendant's Motion to Dismiss

Currently pending before the Court is defendant's motion to dismiss.  (Docket # 15).  Defendant moves to dismiss the Indictment against him on the following grounds: (i) void for vagueness, (ii) his due process rights were violated, (iii) he was not required to register, pursuant to SORNA, until the Final Rule by the Attorney General became effective; (iv) SORNA violates the separation of powers clause, (v) SORNA violates the *Ex Post Facto* Clause, (vi) SORNA violates the Tenth Amendment, and (vii) SORNA violates the Commerce Clause.  (Docket # 15).

A.    <u>Void for Vagueness</u>: Defendant moves to dismiss the Indictment against him on grounds that SORNA "is unconstitutionally vague" "as applied to a transient person such as" he.  <u>See</u> Affirmation of Anne M. Burger, Esq. (hereinafter "Burger Aff.") annexed to Docket # 15 at ¶ 8.  Specifically, Kimble asserts that in April 2009 he moved to Florida to care for his "very ill" sister and he did not have a permanent address in Florida.  <u>Id.</u>  Kimble asserts that SORNA defines the term "resides" as "a place where one has a home or 'habitually' lives" and, as a result, SORNA's registration requirements are "unconstitutionally vague" for transient persons who do not have a permanent home or "habitually

live" at a certain residence.[3]   Id.   Kimble argues that SORNA's "definition of 'resides' fails to put a transient offender on notice of when he need register in a state, and, for that matter, after how may days or nights in a temporary location the failure to register becomes a federal criminal offense."   Id.   Kimble maintains that 18 U.S.C. § 2250(a) – the section of SORNA that criminalizes a sex offender's failure to register – "is unconstitutionally vague because neither citizens nor law enforcement officers have fair warning about the application of the registration requirements to transient persons."   Id. at ¶ 18. Kimble contends that "SORNA simply does not specify how an offender who has left a permanent living situation but has not yet secured a new one should proceed" nor does it "provide sufficient guidance as to what constitutes a residence or how to navigate the system during the period of time when an offender such as Mr. Kimble has no fixed, permanent living situation."   Id. at ¶¶ 18, 21.   As a result, Kimble argues that "SORNA did not provide constitutionally acceptable notice to Mr. Kimble as to what was required of him when he left New York."   Id.

In response, the Government asserts that "defendant did not live a transient lifestyle riding the rails, wandering the streets with his belongings on his back, or moving from homeless shelter to

---

[3]   SORNA does not provide a definition for the term "residence."

10

homeless shelter on a daily basis." <u>See</u> Gov. Opp. Memo at p. 10.

Rather, defendant "maintained a residential address in Florida for

months and applied for and received Welfare benefits from the State

of Florida for more than half a year, while trying to hide from the

Rochester Police." <u>Id.</u>  The Government contends that "Kimble did

not live a transient lifestyle but instead maintained a residential

address for months in Florida" after leaving New York shortly after

"being questioned by Rochester Police about a cold-case they were

investigating." <u>Id.</u> at p. 13.  The Government argues that Kimble

"fled to Florida" and "deliberately concealed his new location and

status as a Florida resident from the State of New York." <u>Id.</u>

   "As the Supreme Court has noted even regarding the stringent

vagueness review of statutes that impinge on the First Amendment,

'perfect clarity and precise guidance have never been required.'"

<u>United States v. Lott</u>, No. 2:11-cr-97, 2012 WL 2048218, at *2 (D.

Vt. June 6, 2012)(quoting <u>United States v. Williams</u>, 553 U.S. 285,

304 (2008)).  The Second Circuit has held that SORNA's language and

legislative history make it "clear that a registrant must update

his registration information if he alters his residence such that

it no longer conforms to the information that he earlier provided

to the registry." <u>United States v. Van Buren</u>, 599 F.3d 170, 175

(2d Cir. 2010).  When a sex offender relocates to a new location he

is required to update his registration information "even if the sex

offender has not yet established a new residence." <u>Id.</u>  In <u>United</u>

<u>States v. Murphy</u>, the Tenth Circuit pointed out that SORNA "§ 16913(a) does not say that a sex offender must register in a jurisdiction only if he maintains an unchanging *residence*." 664 F.3d 798, 801 (10th Cir. 2011). Rather, the court noted that "[w]hen someone changes residence – whether by leaving his home, moving into a new dwelling, becoming homeless, or other means – he has a reporting obligation." <u>Id.</u> Thus, even in circumstances where an individual is evicted from an apartment and becomes homeless, he must update his registration "even if he has yet to establish a new residence." <u>Id.</u>; <u>see</u> <u>also</u> <u>United States v. Voice</u>, 622 F.3d 870, 875 (8th Cir. 2010)(rejecting "the suggestion that a savvy sex offender can move to a different city and avoid having to update his SORNA registration by sleeping in a different shelter or other location every night"). Citing the Second Circuit's <u>Van Buren</u> decision, the Fourth Circuit concluded that SORNA "is not unconstitutionally vague" with respect to its registration requirements. <u>United States v. Bruffy</u>, 466 F. App'x 239, 244 (4th Cir. 2012)(remarking that although the defendant did not have a permanent residence he was "transient in a defined jurisdiction" and "a transient person of ordinary intelligence would have recognized after four weeks of living in and around the Belle Haven area of Fairfax County, Virginia, that he was habitually living there and was required by SORNA to update his registration information").

12

Here, defendant Kimble relocated from Rochester, New York to Sarasota, Florida in April 2009 and lived in the Sarasota area until January 11, 2010 when he was arrested. Although Kimble maintains that he did not have a permanent address while he was in Florida, the record before the Court shows that Kimble applied several times for various Florida State benefits and repeatedly listed his sister's 1060 Indian Park Drive, Sarasota, Florida 34234 address. He claimed on the application forms that he paid $700.00 per month for rent and paid for other utilities at the residence as well. Even if the facts are as Kimble suggests, "the alternative formulation of 'other place where the individual habitually lives,' is sufficiently clear to have given him notice of whether his conduct was prohibited by the Act." United States v. Lott, 2012 WL 2048218, at *2. Considering all of these circumstances, I find that any person could reasonably find that Kimble had established a "residence" in the state of Florida and was therefore required to update his sex offender registration information. In sum, I conclude that SORNA's use of the term "resides" with respect to registration requirements is not unconstitutionally vague. Accordingly, it is my Report and Recommendation that defendant's motion to dismiss the Indictment on void for vagueness grounds be **denied.**

B.   Due Process: Defendant Kimble also moves to dismiss on grounds that SORNA violates his due process rights under the United

States Constitution.  <u>See</u> Burger Aff. at ¶ 23.  Specifically, Kimble asserts that on October 22, 1999 – shortly before his release from New York State prison and before SORNA was enacted – he "was ordered adjudicated a level three sex offender under New York State law."  <u>Id.</u> at ¶ 24.  Kimble contends that at that time there was a federal court injunction in place relating to a constitutional challenge to the New York State Sex Offender Registration Act (hereinafter "the New York Act"), as Southern District Court Judge Denny Chin had concluded in <u>Doe v. Pataki</u> that the New York Act violated the United States Constitution.  <u>Id.</u> (citing <u>Doe v. Pataki</u>, 3 F. Supp. 2d 456 (S.D.N.Y. 1998)).  Kimble asserts that he "was subjected to a sex offender determination under the New York Act at a time when the statute had been declared unconstitutional by a federal district court" and, as a result, any use of his "prior unconstitutional state sex offender adjudication, and its resulting obligations, would be analogous to the use of an unconstitutional finding in immigration against an alien in a prosecution for a violation of 8 U.S.C. § 1326."  <u>See</u> Burger Aff. at ¶¶ 26-27.  Kimble argues that any use of his New York State sex offender determination for any purpose "would result in a violation of Mr. Kimble's right to due process under the United States Constitution."  <u>Id.</u> at ¶ 27.

In response, the Government points out that the <u>Doe v. Pataki</u> litigation ultimately concluded with a settlement agreement which

required the New York State Office of Court Administration to send notice to Level III sex offender plaintiffs informing them of their right to a redetermination hearing.  Defendant Kimble was a member of the plaintiff class based on his 1999 classification as a Level III offender, was notified of his right to a redetermination hearing, requested a redetermination hearing pursuant to the <u>Doe v. Pataki</u> litigation, and did in fact have a redetermination hearing. On February 16, 2005, a redetermination hearing was held before Monroe County Acting Supreme Court Justice John J. Brunetti. Defendant was represented by counsel during this hearing. Ultimately, Justice Brunetti determined that defendant Kimble was to be classified a Level III sex offender.  <u>See</u> Exhibits "9" and "10" attached to Gov. Opp. Memo.  The Government argues that since defendant had the opportunity and took advantage of his right to contest his risk level determination in open court before an independent, impartial new judge at a due process hearing, "[h]e cannot now assert that his original designation violated his due process rights" and "cannot now assert a <u>Pataki</u> due process defense to the underlying determination that he is a Level III offender." <u>See</u> Gov. Opp. Memo at pp. 15-16.

During the November 10, 2011 hearing, defense counsel, Anne M. Burger, Esq., raised the argument that Mr. Kimble was not physically present during the February 16, 2005 redetermination hearing and, as a result, he was not properly afforded due process.

15

Attorney Burger requested time to order additional court records
which would reflect and support this argument.   After several
extensions of time for Burger to obtain such court records, on
August 22, 2012, Burger advised the Court that defendant's argument
on this issue was in fact "complete" and that no new additional
documents would be filed in support thereof.

"An essential principle of due process is that a deprivation
of life, liberty, or property be preceded by notice and opportunity
for hearing appropriate to the nature of the case." Cleveland Bd.
of Educ. v. Loudermill, 470 U.S. 532, 542 (1985)(internal quotation
mark and citation omitted).   Accordingly, "[w]hen a person's
liberty interests are implicated, due process requires at a minimum
notice and an opportunity to be heard before a neutral
decision-maker."   Singleton v. Lee, Nos. 09-CV-6654(MAT),
11-CV-6293(CJS), 2012 WL 864801, at *9 (W.D.N.Y. Mar. 13, 2012).

Here, it is clear that Kimble received notice and was afforded
an opportunity for a redetermination hearing, applied for
redetermination, and was represented by counsel at a
redetermination hearing before a neutral State court judge who made
a *new* determination regarding his sex offender risk level status.
Even if the hearing was conducted in Kimble's absence – which is
not supported in the record before the Court – I find that his due
process rights were not violated under these circumstances. See,
e.g., Singleton v. Lee, 2012 WL 864801, at *9 (Judge Telesca held

16

that petitioner-Level III sex offender's due process claim lacked merit because he was afforded notice and a redetermination hearing where he had counsel present, even though petitioner failed to appear at the hearing). Kimble was "clearly was provided with all of the process due to him in connection with the determination of his risk level." Id. Accordingly, it is my Report and Recommendation that defendant Kimble's motion to dismiss on due process violation grounds be **denied.**

C. Administrative Procedures Act: On July 27, 2006, the federal Sex Offender Registration and Notification Act ("SORNA" or "the Act") was enacted. 42 U.S.C. § 16911 et seq. SORNA requires convicted sex offenders to provide State governments with personal information, including their names and current addresses, for state and federal sex offender registries, and to update such information. Under the Act, it is a crime for a person who is required to register who "travels in interstate or foreign commerce, or enters or leaves, or resides in, Indian country" to "knowingly fail[] to register or update a registration as required by" the Act. See 18 U.S.C. § 2250(a). The Act authorizes the Attorney General "to specify the applicability of the [registration] requirements of this subchapter to sex offenders convicted before" SORNA's enactment. 42 U.S.C. § 16913(d). The Attorney General is also directed in the Act to "issue guidelines and regulations to interpret and implement" the Act. Id. at § 16912(b).

In <u>Reynolds v. United States</u>, ___ U.S. ___, 132 S. Ct. 975 (2012), the Supreme Court resolved a Circuit split and held that SORNA is not automatically retroactive to sex offenders convicted before July 26, 2007, the Act's effective date.  Instead, the Court held that "pre-Act" sex offenders cannot be held to the requirements of SORNA until the Attorney General properly issues regulations specifying that the Act's registration provisions apply to them.  <u>Id.</u> at 984 ("[W]e conclude that the Act's registration requirements do not apply to pre-Act offenders until the Attorney General so specifies.").

What <u>Reynolds</u> explicitly left open, however, was which, if any, of the post-SORNA rules and guidelines issued by the Attorney General are valid and enforceable against pre-Act offenders.  There are three separate administrative rules or guidelines issued by the Attorney General which have been the subject of post-<u>Reynolds</u> litigation.  First, on February 28, 2007, the Attorney General issued an "interim rule" making SORNA effective immediately to all sex offenders, including those convicted of eligible offenses before SORNA was enacted.  <u>See</u> 28 C.F.R. § 72.3.  Second, on May 30, 2007, the Attorney General published proposed guidelines from the Office of Sex Offender Sentencing, Monitoring, Apprehending, Registering, and Tracking ("SMART Guidelines") reiterating the authority of the Attorney General to make SORNA applicable to sex offenders "whose convictions predate" the effective date of SORNA.

18

See Notice, 72 Fed. Reg. 30201-01 (proposed May 30, 2007).   The
SMART Guidelines were subject to public comment, were published in
a final version on July 2, 2008, and took effect on August 1, 2008.
Finally, on December 29, 2010, the Attorney General "finalized" the
interim rule issued in February 2007.   The finalized interim rule
became effective on January 28, 2011.

On March 8, 1983, defendant Kimble was convicted of Rape in
the First Degree, a sexual offense, in violation of New York State
Penal Law § 130.65, and was sentenced to 10-20 years in prison.
Kimble served sixteen years in prison, and upon his release from
prison in 1999 he was required to complete an initial sex offender
registration in compliance with New York State's sex offender
registry.   In April 2009, the Government alleges that Kimble
traveled from New York State to the State of Florida.   The
Government claims Kimble never updated his sex offender
registration upon his arrival in Florida.   On June 14, 2011, a
federal grand jury sitting in the Western District of New York
returned an Indictment charging the defendant with one Count of
Failure to Register as a Sex Offender in violation of 18 U.S.C. §
2205(a).   See Indictment (Docket # 8).

There is no dispute that Kimble is a pre-Act offender.   In
the post-Reynolds world, the date on which the requirements of
SORNA became applicable to Kimble determines the viability of his
prosecution by the Government.   Here, Kimble asserts that the

19

Indictment should be dismissed because he was not subject to SORNA's registration requirements until the Final Rule by the Attorney General became effective in January 2011. On this basis, Kimble seeks dismissal of the Indictment.

Kimble allegedly first traveled to Florida in April 2009. Therefore, if it was not until the Attorney General's implementation of the Final Rule in 2011 that SORNA became applicable to pre-Act sex offenders, then under <u>Reynolds</u> Kimble is not subject to prosecution. On the other hand, if <u>either</u> the Attorney General's 2007 interim rule or the 2008 SMART Guidelines were legally sufficient to notify pre-Act offenders like Kimble that the Act's registration provisions apply to them, then Kimble's argument that SORNA's registration requirements did not apply to him must fail.

As to the Attorney General's 2007 interim rule, there is a split in the Circuits as to whether the Attorney General provided reasons sufficient to establish good cause to bypass the Administrative Procedure Act's ("APA") notice, comment and publication requirements and thus make the interim rule immediately effective. <u>Compare</u> <u>United States v. Dean</u>, 604 F.3d 1275, 1279-82 (11th Cir. 2010)(holding that "the public safety argument advanced by the Attorney General is good cause for bypassing the notice and comment period"), <u>and</u> <u>United States v. Gould</u>, 568 F.3d 459, 470 (4th Cir. 2009)(finding that on February 28, 2007 the Attorney General

had good cause to invoke the exception to the APA because "[t]here was a need for legal certainty about SORNA's 'retroactive' application to sex offenders convicted before SORNA" and he had "a concern for public safety that these offenders be registered ... as quickly as possible"), with United States v. Johnson, 632 F.3d 912, 928 (5th Cir. 2011)(finding the Attorney General's reasons for bypassing the APA's notice and comment provisions unpersuasive), and United States v. Valverde, 628 F.3d 1159, 1169 (9th Cir. 2010)(holding that the Attorney General's reasons for bypassing the APA's procedural requirements did not constitute good cause), and United States v. Cain, 583 F.3d 408, 420-24 (6th Cir. 2009)(finding that the Attorney General did not provide reasons sufficient to establish that he had good cause to bypass the APA's notice, comment and publication requirements).  The Second Circuit has not yet decided whether the interim rule was effective and Kimble urges the Court to adopt the reasoning of the Fifth, Sixth and Ninth Circuits in holding the Attorney General's interim rule ineffective as to pre-Act offenders.

In Kimble's case however, I need not decide whether the Attorney General had good cause for bypassing the APA's procedural requirements because I agree with every court that has addressed this issue, that the SMART Guidelines, effective August 1, 2008, were a proper and valid exercise of the Attorney General's authority and effectively made SORNA applicable to pre-Act sex

offenders.   As one district court within the Second Circuit recently held:  "[T]he 2008 SMART Guidelines mark the <u>latest</u> <u>point</u> at which any Circuit to address the question has found SORNA to apply to pre-Act sex offenders."  <u>United States v. Lott</u>, No. 2:11-cr-97, 2012 WL 2048218, at *5 (D. Vt. June 6, 2012)(emphasis added).  <u>See</u> <u>United States v. Stevenson</u>, 676 F.3d 557, 561 (6th Cir. 2012)(collecting cases).  Kimble's travel allegedly occurred in April 2009 – well after the 2008 SMART Guidelines went into effect. As a result, I find that the defendant's travel took place long after SORNA's retroactivity became effectively applied to him.

Kimble seeks to avoid the effective date of the SMART Guidelines by arguing that they "do not constitute a 'valid specification'" because they "are interpretative rules and policy statements and not legislative rules having the force and effect of a substantive rule."  <u>See</u> Defendant's Supplemental Memo (Docket # 30) at p. 5.  Defendant contends that interpretative rules only "clarif[y] an already-existing law" and "do not create new law, rights, or duties."  <u>Id.</u> at p. 4, 7 (internal quotation marks and citation omitted).  Defendant argues that the 2008 SMART Guidelines therefore do not constitute "the 'valid specification' described in <u>Reynolds</u>."  <u>Id.</u> at p. 10.

Earlier this year, the Sixth Circuit rejected the same argument made by a similarly situated pre-Act sex offender with respect to the validity of the SMART Guidelines.  <u>United States v.</u>

22

Stevenson, 676 F.3d 557 (6th Cir. 2012).  The reasoning in Stevenson

is persuasive and therefore is set forth fully below:

> [T]he defendants argue that the SMART guidelines should
> not be deemed a valid rule *on retroactivity* because they
> were promulgated pursuant to the Attorney General's
> authority under § 16912(b), not his authority under §
> 16913(d). They argue that § 16912(b) authorizes the
> Attorney General to issue only interpretative guidance on
> SORNA, not substantive rules, and even if § 16912(b) did
> authorize substantive rules, a rule regarding
> retroactivity promulgated under § 16912(b) would be
> outside the scope of the enabling statute because only §
> 16913(d) gave the Attorney General the power to establish
> retroactivity. We reject these arguments for three
> reasons.
>
> First, the SMART guidelines themselves adequately make
> reference to both § 16912(b) and § 16913(d) for
> legislative authority. The defendants are correct that
> the proposed guidelines state that they were enacted to
> "carry out a statutory directive to the Attorney General
> in section 112(b) of SORNA (42 U.S.C. 16912(b)) to issue
> guidelines to interpret and implement SORNA." 72 Fed.Reg.
> 30,210, 30,210. However, in the discussion of
> retroactivity, the proposed SMART guidelines do not
> merely refer back to the Interim Rule, as the defendants
> claim. The SMART guidelines state: "The applicability of
> the SORNA requirements is not limited to sex offenders
> whose predicate sex offense convictions occur following
> a jurisdiction's implementation of a conforming
> registration program. Rather, SORNA's requirements apply
> to all sex offenders, including those whose convictions
> predate the enactment of the Act." 72 Fed.Reg. 30,210,
> 30,212. Only then does the provision reiterate that the
> Attorney General has the authority to do so "pursuant to
> the authority under SORNA section 113(d) [§ 16913(d) ]"
> and did in fact do so in the Interim Rule. *Id.* The APA
> does not require that the proposed rule cite the relevant
> legal authority in a certain location, but rather
> requires just that notice must be given for any proposed
> rule. 5 U.S.C. § 553(b)(2). We do not hesitate to find
> that the SMART guidelines adequately gave notice of the
> relevant legal authority in this case.
>
> Second, even if the SMART guidelines were solely
> promulgated under § 16912(b), the Attorney General still

had the authority to address the retroactivity of SORNA in substantive rules pursuant to § 16912(b), because § 16912(b) incorporates by reference § 16913(d).

As an initial matter, the defendants are incorrect that § 16912(b) provides the Attorney General authority solely to interpret SORNA and not to make substantive rules. By its own terms, § 16912(b) authorizes the Attorney General to make both interpretative and substantive rules because it unambiguously permits the Attorney General to make rules regarding both the interpretation *and* implementation of the sections therein. Substantive rules are "rules that *implement* the statute." *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 n. 31, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979) (internal quotation marks omitted) (emphasis added). Interpretive rules, which explicate the meaning of statutes, are less restrictive because they do not have the force or effect of law. *Id.* When, as here, Congress has "directly spoken to the precise question at issue ... [we] must give effect to the unambiguously expressed intent of Congress." *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *Citizens Coal Council v. U.S. E.P.A.*, 447 F.3d 879, 890–92 (6th Cir.2006) (en banc). Section 16912(b) unambiguously gives the Attorney General the authority to make substantive rules on how to implement SORNA.

Section 16912(b) also unambiguously instructs the Attorney General to make the necessary regulations to "implement this subchapter." 42 U.S.C. § 16912(b). The applicable "subchapter" in this case is "Subchapter I—Sex Offender Registration and Notification," 42 U.S.C. §§ 16901–16962. Section 16913(d) indisputably falls within that subchapter. Although § 16912(b) does not explicitly authorize the Attorney General to make rules on retroactivity, we cannot ignore that § 16912(b) instructs the Attorney General to implement the subchapter, and the subchapter includes the specific option of making a rule on retroactivity. *See Reynolds*, 132 S.Ct. at 981–82 (recognizing Congress charged the Department of Justice with examining the many potential applications of SORNA and implementing SORNA accordingly, citing in part § 16912(b)); *see also Chevron*, 467 U.S. at 842–43, 104 S.Ct. 2778 (deferring to agency's permissible construction of the statute if language is ambiguous). When Congress broadly authorizes an agency to implement the remainder of a statute in one section and then

specifies in the very next section a specific type of
rule the agency is expressly authorized to make, we can
hardly fault the agency for citing the section giving it
broad authorization when issuing substantive rules
including the specific one expressly authorized in
another section of the exact same statute. This is
consistent with our review of agency rules with reference
to the enabling statute as a whole, not any particular
provision in isolation. *Nat'l Cotton Council of Am. v.
U.S. E.P.A.*, 553 F.3d 927, 933 (6th Cir.2009) (citing
*Nat'l Ass'n of Home Builders v. Defenders of Wildlife*,
551 U.S. 644, 666, 127 S.Ct. 2518, 168 L.Ed.2d 467
(2007)), *cert. denied*, --- U.S. ----, 130 S.Ct. 1505, 176
L.Ed.2d 110 (2010); *see also Riverkeeper, Inc. v. U.S.
E.P.A.*, 358 F.3d 174, 185-86 (2d Cir.2004) (analyzing
extent of agency's authorization in enabling statute with
reference to other sections explicitly cross-referenced
in statute). Best practices may include citing all
relevant sections of an enabling statute, but failure to
do so does not establish that this rule was outside the
scope of Congress's authorization.

Finally, any error with respect to the Attorney General's
recitation of the proper legal authority was not
prejudicial. *See* 5 U.S.C. § 706. As we discussed in
*Utesch*, 596 F.3d at 311-13, the key to whether an
agency's procedural error in promulgating a rule is
harmless error hinges not on whether the same rule would
have issued absent the error, but whether the affected
parties had sufficient opportunity to weigh in on the
proposed rule. *Id.* at 312 (citing *Riverbend Farms, Inc.
v. Madigan*, 958 F.2d 1479, 1487 (9th Cir.), *cert. denied*,
506 U.S. 999, 113 S.Ct. 598, 121 L.Ed.2d 535 (1992)).
"[W]hen the purposes of the procedural requirements have
been fully met, there is no need for the courts to
require rigid adherence to formalistic rules." *Brown &
Williamson Tobacco Corp. v. F.T.C.*, 710 F.2d 1165, 1174
(6th Cir.1983), *cert. denied*, 465 U.S. 1100, 104 S.Ct.
1595, 80 L.Ed.2d 127 (1984). Even if the proposed SMART
guidelines referenced primarily § 16912(b), they also
unequivocally stated that the SORNA would apply
retroactively. The Attorney General received and
addressed numerous comments from the public on the issue
of retroactivity. *See* 73 Fed.Reg. 38,030, 38,035-36.
Therefore, the parties cannot complain of either a lack
of adequate notice or opportunity to be heard
meaningfully on the issue of retroactivity. *See Utesch*,
596 F.3d at 310 (requiring "actual consideration of

public commentary"); *Brown*, 710 F.2d at 1173. We are
therefore confident that the Attorney General's initial
citation to § 16912(b), even if a technical violation of
the APA's notice requirement, "clearly had no bearing on
the procedure used or the substance of decision reached."
*Riverbend Farms*, 958 F.2d at 1487 (internal quotation
marks omitted).

For all these reasons, the SMART guidelines can and do
have the force and effect of law, and they establish that
SORNA became retroactive as of August 1, 2008. The
Attorney General was properly delegated authority by
Congress to enact the substantive rule regarding
retroactivity and the authority to implement SORNA. The
SMART guidelines clearly set forth the rule on
retroactivity and the authority to issue such a rule and
were properly promulgated pursuant to all of the other
notice-and-comment requirements in the APA. They became
final on August 1, 2008, thirty days after they were
published. *See Utesch*, 596 F.3d at 310-11; *Trent*, 654
F.3d at 582-83.

United States v. Stevenson, 676 F.3d at 563-66 (internal footnotes

omitted).  I agree with the reasoning set forth in Stevenson and

find that the SMART Guidelines establish that SORNA became

retroactive in 2008.  Since Kimble's alleged travel took place in

2009, he was subject to SORNA's requirements.  Accordingly, it is

my Report and Recommendation that his motion to dismiss the

Indictment because he was not subject to SORNA's registration

requirements until the Final Rule by the Attorney General became

effective in January 2011 should be denied.

    D.   Defendant's Remaining Arguments: Defendant's remaining

arguments for dismissing the Indictment are that (i) the *Ex Post

Facto* Clause bars his prosecution, (ii) SORNA violates the Tenth

Amendment, (iii) a violation of the separation of powers clause/non-

delegation doctrine exists here, and (iv) SORNA violates the Commerce Clause.   Defendant acknowledges that each of those arguments is expressly foreclosed by Second Circuit case law.[4] United States v. Guzman, 591 F.3d 83 (2d Cir. 2010)(rejecting *Ex Post Facto* Clause, Commerce Clause, Tenth Amendment, non-delegation doctrine, and failure to implement arguments), *cert. denied*, 130 S. Ct. 3487 (2010).   Therefore, I find that those claims are precluded by binding precedent and cannot form the basis for dismissing the Indictment.   Accordingly, it is my Report and Recommendation that defendant's motion to dismiss the Indictment (Docket # 15) on these additional grounds be **denied.**

## II.  Defendant's Motion to Suppress

Finally, the Court addresses Kimble's motion to suppress statements he made to the Sarasota Florida Police during an interview after his arrest on January 11, 2010. (Docket # 20). Kimble admits that he was read his Miranda rights, but contends that during the interview he told the police he no longer wished to speak with them but was made to continue.   Kimble argues that because he was subjected to a "police custodial interrogation" after telling the police that he did not want to speak with them and that he wanted an attorney, "the police should have ceased their questioning

---

[4] Kimble makes these arguments to preserve them in the event of further Supreme Court analysis of SORNA.

27

of him." <u>See</u> Affirmation of Anne M. Burger, Esq. annexed to Docket # 20 at ¶ 8.  Kimble maintains that "rather than stop their questioning the police continued to questioned [sic] him at length obtaining additional statements" and, therefore, "the Court should suppress the use of these statements at trial." <u>Id.</u>

There is no dispute that defendant Kimble was "in custody" and subjected to a "custodial interrogation."  There is also no dispute that Kimble was read his <u>Miranda</u> rights and waived those rights. The issue before the Court is whether Kimble invoked his right to an attorney during the police interrogation but was nonetheless subjected to continued police questioning without counsel.

If a suspect waives his right to counsel after receiving his <u>Miranda</u> warnings, law enforcement officers are free to question him. However, if a suspect requests counsel at any time during the interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation.  <u>See</u> <u>Edwards v. Arizona</u>, 451 U.S. 477, 484-85 (1981). The invocation of the <u>Miranda</u> right to counsel "requires, at a minimum, some statement that can reasonably be constructed to be an expression of a desire for the assistance of an attorney." <u>McNeil v. Wisconsin</u>, 501 U.S. 171, 178 (1991).  "But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to

28

counsel, our precedents do not require the cessation of
questioning." Davis v. United States, 512 U.S. 452, 459 (1994).
Instead, "the suspect must unambiguously request counsel." Id. at
459, 462 (holding that the "Maybe I should talk to a lawyer" remark
made by the petitioner "was not a request for counsel"); see also
Diaz v. Senkowski, 76 F.3d 61, 63, 65 (2d Cir. 1996)(finding that
the defendant "did not effectively assert his right to counsel"
where defendant stated "I think I want a lawyer" and "Do you think
I need a lawyer?" to the police). The Supreme Court has
specifically rejected requiring police "questioning to cease if a
suspect makes a statement that *might* be a request for an attorney."
Davis, 512 U.S. at 461.

Viewed in light of Supreme Court precedent, Kimble's statement
– "Maybe I do need an attorney then because if you're placing the
blame somewhere" – was not an unambiguous invocation of his right
to counsel and therefore law enforcement officials were not required
to cease their interrogation until counsel became available. After
reviewing the video of the interrogation, I find that Kimble's
statement was not sufficiently and unequivocally clear enough that
a reasonable police officer under the circumstances would understand
the statement to be a request for an attorney. See Davis, 512 U.S.
at 459. Kimble never said that he wanted a lawyer, that he wanted
the detectives to get him a lawyer, or that he no longer wished to
speak to the detectives without a lawyer. As a result, I find that

29

Kimble did not sufficiently invoke his right to counsel.  <u>Bush v.</u>
<u>Kirkpatrick</u>, No. 06-CV-0771T, 2010 WL 415288, at *4 (W.D.N.Y. Jan.
28, 2010)("An ambiguous or equivocal reference to an attorney that
would cause a reasonable officer only to suspect that the defendant
might be invoking the right to counsel does not require the
cessation of questioning.").  Accordingly, it is my Report and
Recommendation that defendant's motion to suppress statements
(Docket # 20) be **denied.**


### Conclusion

For the foregoing reasons, it is my Report and Recommendation
that defendant's motion to dismiss (Docket # 15) be **denied** and
defendant's motion to suppress statements (Docket # 20) be **denied.**
**SO ORDERED.**


_____
      JONATHAN W. FELDMAN
United States Magistrate Judge

Dated: September 5, 2012
Rochester, New York

30

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED,** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59(b)(2) of the Local Rules of Criminal Procedure for the Western District of New York.[5]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See, e.g., Patterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.,* 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn,* 474 U.S. 140 (1985); *Wesolek v. Canadair Ltd., et al.,* 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 59(b)(2) of the Local Rules of Criminal Procedure for the Western District of New York, "[w]ritten objections ... shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority." **Failure to comply with the provisions of Rule 59(b)(2) may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the Plaintiff and the Defendant.

**SO ORDERED.**

_____
Jonathan W. Feldman
United States Magistrate Judge

Dated:     September 5, 2012
           Rochester, New York

_____

[5]   Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(D) commences with the filing of this Report and Recommendation.  Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the fourteen days allowed for filing objections has elapsed.  <u>United States v. Andress</u>, 943 F.2d 622 (6th Cir. 1991); <u>United States v. Long</u>, 900 F.2d 1270 (8th Cir. 1990).